IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| SEAN ROBERT ADDISON, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| Plaintiff, | ) | |
| | ) | 2:13-CV-71-LGW-JEG |
| vs. | ) | |
| | ) | |
| JOSEPH ARNETT ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S BRIEF IN RESPONSE TO
DEFENDANTS' MOTION TO DISMISS,
OR, IN THE ALTERNATIVE,
MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiff, Sean Addison, and files this his Brief in Response to

Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.  (D.E.

34.)  For the reasons that follow, Defendants' motion should be denied.

**INTRODUCTION**

This case presents a textbook situation of deliberate indifference on the part of the

defendants, all of whom are sworn correctional officers.  The short of it is that the defendants

subjected, Addison, a black inmate, to a gratuitous beating at the hands of another, known racist,

gang-member inmate by the name of "Toker" or "Gutierrez".  They ignored what information

they had of Gutierrez's violent and racist history and placed a handcuffed Addison in the same

"recreation cage" as Gutierrez.  Gutierrez took advantage of this opportunity and beat the

defenseless, trapped Addison for several minutes while the defendants simply stood outside the

cage and watched.  In essence, the defendants did the one thing with a prisoner that the Supreme

Court has held they cannot do under the Eighth Amendment with regard to inmate-on-inmate

assaults: "let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

## STATEMENT OF FACTS[1]

Plaintiff, Sean Addison, is a federal inmate.  (Addison Decl. ¶ 2.)  He was incarcerated at the federal correctional institution located at Jessup, Georgia, also known as FCI-Jessup, from February 2008 to June 2010.  (*Id.* ¶¶ 3-4.)  In April 2010, Addison was placed in the Special Housing Unit or SHU at FCI-Jessup.  (*Id.* ¶ 5.)[2]

Inmates assigned to the SHU are generally allowed recreation once a day for a period of one hour.  (Addison Decl. ¶ 6.)  SHU officers generally conduct a walkthrough among SHU inmates during the early morning hours to determine which inmates wish to attend recreation later that day.  (*Id.* ¶ 7.)  Once the officers complete their walkthrough, the officer in charge of recreation is responsible for assigning the inmates to their respective "recreation cages".  (*Id.* ¶ 11; *see also* Bowen Decl. ¶ 5.)[3]  These cages consist of small chain-link fence enclosures and generally house between four and five inmates each.  (Velez Decl. ¶ 13.)  It is the job of the SHU officer in charge of recreation to ensure that certain inmates are not assigned to the same cage as other inmates.  (Addison Decl. ¶ 7.)  This is especially the case for inmates who pose a danger to other inmates based on their prior history, which may include gang affiliations, racist beliefs, and

---

[1] With a few exceptions (noted below), the following facts are taken from the Second Amended Complaint, which is being filed in conjunction with this response brief, and from the sworn statements of Sean Addison (hereafter "Addison Decl.") Marco Velez (hereafter "Velez Decl."), and Terrance Tomlinson (hereafter "Tomlinson Aff.").  The Tomlinson Affidavit is supplied to this Court as an attachment to Addison's Declaration.  Regardless of whether the court considers the defendants' motion as one seeking dismissal under Rule 12(b)(6) or summary judgment under Rule 56 of the Federal Rules of Civil Procedure, it should construe all the facts in the light most favorable to Addison, the non-movant, and draw all reasonable inferences in his favor. *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 728 n.1 (11th Cir. 2010) (standard of review for summary judgment motion); *Wilson v. Strong*, 156 F.3d 1131, 1133 (11th Cir. 1998) (standard of review for motion to dismiss).

[2] The SHU is meant to house inmates who are in need of protection from themselves or other inmates, or who have violated prison rules and regulations.  *See Jordan v. Arnold*, 408 F. Supp. 869, 870-71 (M.D. Pa. 1976).

[3] "Bowen Decl." refers to the Declaration of Jeremy Bowen submitted as part of the defendants' motion for summary judgment.  (*See* D.E. 34-1 at 6-7.)

specific, past incidents.  (*Id.*)  These problematic inmates are sometimes referred to as "separatees" or "separates" vis-à-vis certain other inmates.  (*See* Arnett Decl. ¶ 7; 2d Am. Compl. ¶ 16.)[4]

Addison indicated to a SHU officer during the early morning hours of May 27, 2010 that he wished to attend recreation that day.  (Addison Decl. ¶ 7.)  Addison didn't know it, but another inmate inside the SHU by the name of "Toker" or "Gutierrez" was also signed up for recreation.  (*Id.* ¶ 8.)  Gutierrez was a member of the Sureno gang.  (Addison Decl. ¶ 10; Velez Decl. ¶ 10.)   One of the characteristics of this gang is its racist attitude toward blacks.  (Addison Decl. ¶ 10.)  Gutierrez had himself assaulted other black inmates because of his gang affiliation and his hatred toward blacks.  (Addison Decl. ¶ 9; Velez Decl. ¶ 10.)  In one of these incidents, Gutierrez beat an older, black inmate with a lock stuffed inside a sock.  (Velez Decl. ¶ 10.)  This incident led to a confrontation between Gutierrez and other black inmates and, ultimately, to a lockdown of the entire prison compound for two days.  (Addison Decl. ¶ 9; Velez Decl. ¶ 10.)  All this information was contained in Gutierrez's central inmate file.[5]

Officer Bowen, one of the defendants in this action, was the SHU officer in charge of recreation on May 27, 2010.  (Addison Decl. ¶ 11; Bowen Decl. ¶ 5.)  As an officer assigned to the SHU, he knew about Gutierrez's gang affiliation and his violent, racist history with black inmates.  (Addison Decl. ¶ 12.)  Bowen also researched the central inmate files of the inmates before he assigned them to their respective recreation cages.  He did this for Gutierrez and for Addison.  (*See* Bowen Decl. ¶ 8 (explaining that he "*re*-checked" Addison's and Gutierrez's

---

[4] "Arnett Decl." refers to the Declaration of Joseph Arnett submitted as part of the defendants' motion for summary judgment.  (*See* D.E. 34-1 at 8-9.)

[5] *See Tyree v. Hope Village, Inc.*, 677 F. Supp. 2d 109, 111 (D.D.C. 2009) ("Incident and disciplinary hearing reports are maintained as part of an inmate's central file, which is maintained by the BOP in its Inmate Central Records System") (citation omitted).

"paperwork" following the incident) (emphasis added)).  Bowen nevertheless persisted in assigning Addison to the same cage as Gutierrez, despite knowing that Gutierrez posed a real and substantial danger to Addison.  (Addison Decl. ¶¶ 11-12.)

Another defendant in this case, Officer Pickett, escorted Addison to his recreation cage. (*Id.* ¶ 14.)  He led a handcuffed Addison into the recreation area.  (*Id.* ¶¶ 13-14.)  The recreation area is similar to a courtyard in some respects but contains a number of cages in which the inmates are placed for their recreation time.  (Addison Decl. ¶ 15; Velez Decl. ¶ 13.)  As Addison passed the cage to which he was normally assigned, he paused and asked Pickett why he wasn't placing Addison in that cage.  (Addison Decl. ¶¶ 16-17.)  Pickett told Addison that Addison was assigned to a different cage that day and pulled Addison away.  (*Id.* ¶ 17.)

Pickett escorted Addison to recreation cage number five.  (*Id.* ¶ 18.)  Addison noticed there were several Mexican inmates inside the cage, including Gutierrez.  (Addison Decl. ¶ 18; Velez Decl. ¶ 15.)  Addison knew from having been a federal inmate for more than ten years that black inmates are never placed together with Mexican inmates, let alone inmates who are part of Mexican gangs.  (Addison Decl. ¶ 19; Velez Decl. ¶¶ 16-17.)  He also knew Gutierrez and his history of racist behavior against blacks.  (Addison Decl. ¶ 20.)  As an officer assigned to the SHU, Pickett knew about Gutierrez's gang membership and troubled history with blacks. (Addison Decl. ¶¶ 12, 32; Velez Decl. ¶ 31.)

Addison sensed danger and expressed his concern to Pickett.  (Addison Decl. ¶¶ 20-21.) He told Pickett something to the effect of "it's not a good idea to place me in that cage."  (*Id.* ¶ 21.)  But Pickett ignored Addison's concerns, telling Addison "if you want rec, this is where you have to go."  (Addison Decl. ¶ 21; Velez Decl. ¶ 20.)  Pickett never gave Addison the option of being placed in another cage even though Pickett had the authority to make this alternative

placement.  (Addison Decl. ¶ 21; Velez Decl. ¶¶ 19-20; Pickett Decl. ¶ 10.)[6]  Other inmates saw

the danger of placing Addison in the same cage as Gutierrez.  (Velez Decl. ¶ 18.)  One such

inmate was Marco Velez.  (*Id.*)  Mr. Velez yelled out to Addison and Pickett, telling them that

Addison should be placed in another cage.  (*Id.*)  Pickett heard Velez but ignored him.  (*Id.*).

Addison was one of the last inmates to be placed in cage number five.  (Addison Decl. ¶

18; Velez Decl. ¶ 14.)  Upon being placed in the cage, Addison noticed the presence of at least

four SHU officers nearby, including Defendants Bowen and Moseley.  (Addison Decl. ¶ 22.)  It

would have taken but a few seconds for any officer located inside the recreation area to make his

way to Addison's cage.  (*Id.* ¶ 23.)  All of the inmates inside Addison's cage were handcuffed at

this time, including Gutierrez and Addison himself.  (*Id.* ¶ 18; Velez Decl. ¶ 24.) Once Pickett

locked the cage door, the inmates took turns approaching a small slot by the door to have their

handcuffs removed by Pickett.  (Addison Decl. ¶ 24.)  Because the inmates were handcuffed

behind their backs, they had to "back into" the slot to allow the officer access to their cuffed

hands.  (Addison Decl. ¶ 24; Velez Decl. ¶¶ 22-23.)  Gutierrez approached the slot first and was

uncuffed by Pickett.  (Addison Decl. ¶ 24.)  Addison followed.  (*Id.* ¶ 25.)  When Addison

placed his hands through the slot, Gutierrez began violently beating him with punches and kicks.

(Addison Decl. ¶ 25; Velez Decl. ¶¶ 21-22; Tomlinson Aff. ¶ 3.)  Addison yelled at Pickett to

remove his handcuffs but Pickett ignored Addison's pleas; he stepped back from the cage.

(Addison Decl. ¶ 26; Velez Decl. ¶ 22.)  Gutierrez continued pummeling the defenseless

Addison who soon crumpled to the ground and lost consciousness.  (Addison Decl. ¶ 27; Velez

Decl. ¶ 23; Tolimson Aff. ¶ 4.)  Pickett did nothing to intervene.  (Velez Decl. ¶¶ 26-28;

Tomlinson Aff. ¶ 4.)  He did not order Gutierrez to stop.  (Velez Decl. ¶ 28.)  He did not enter

---

[6] "Pickett Decl." refers to the Declaration of Stephen Pickett submitted as part of the defendants'
motion for summary judgment.  (*See* D.E. 34-1 at 4-5.)

the cage and restrain Gutierrez.  (Velez Decl. ¶ 28; Tomlinson Aff. ¶ 4.)  All he did was activate

a "body alarm."  (Pickett Decl. ¶ 6.)

But several other officers (in addition to Pickett) were already present at or near

Addison's cage at the time the beating ensued and the body alarm, activated.  (Addison Decl. ¶

22; Velez Decl. ¶ 26; Tomlinson Aff. ¶ 4.)  These officers included the defendants, Arnett,

Bowen, Mosely, and Wolfort.  (Tomlinson Aff. ¶ 4.)  Gutierrez was unarmed and of slight build.

(Velez Decl. ¶ 27.)  The defendants outsized Gutierrez by a substantial margin.  (2d Am. Compl.

¶ 64.)  Yet none of them took the initiative to intervene.  (Velez Decl. ¶ 28; Tomlinson Aff. ¶ 4.)

They just stood by and watched.  (Tomlinson Aff. ¶ 4.)  All the other inmates inside Addison's

cage remained handcuffed and had retreated to a corner, also unwilling to intervene.  (Velez

Decl. ¶¶ 24, 27.)

Meanwhile, Gutierrez continued to viciously attack Addison.  (Tomlinson Aff. ¶ 4.)

According to Mr. Velez, this was "the most one-sided assault of one person by another I have

seen ever seen."  (Velez Decl. ¶ 25.)  Terrance Tomlinson, a former inmate and another witness

to the beating, described Gutierrez "sitting on top of Addison beating him repeatedly."

(Tomlinson Aff. ¶ 4.)  Addison continued to endure this pummeling for several minutes before

the defendants decided to enter the cage and restrain Gutierrez.  (Velez Decl. ¶ 29; Tomlinson

Aff. ¶ 4.)  By then, Gutierrez had tired himself out from his vicious beating of Addison.  (Velez

Decl. ¶ 30.)

As a result of the beating, Addison suffered significant injuries all over his body.

(Addison Decl. ¶ 33.)  He continues to experience pain and numbness from these injuries and has

seen his mental health deteriorate as a result of his traumatic experience.  (*Id.* ¶¶ 34-35.)

## ARGUMENT AND CITATIONS OF AUTHORITY

**I.     ADDISON'S NOW-FILED SECOND AMENDED COMPLAINT STATES A CLAIM AGAINST ALL DEFENDANTS AND THEIR MOTION TO DISMISS SHOULD BE DENIED.**

Addison has filed a Second Amended Complaint together with this brief in response to Defendants' motion to dismiss, or, in the alternative, motion for summary judgment.  This complaint addresses the claimed deficiencies which Defendants allege exist with Addison's prior, *pro se* complaint, entitled "First Amended Complaint".  (*See* D.E. 26.)

The filing of the Second Amended Complaint without leave of this court is proper.  Rule 15(a) of the Federal Rules of Civil Procedure permits Addison to amend his First Amended Complaint "as a matter of course" because no responsive pleading has yet been filed in this case.  *See Williams v. Board of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1291 (11th Cir. 2007) (a motion to dismiss is a not responsive pleading under Rule 15(a)).  Also, an amendment made pursuant to Rule 15(a) "as a matter of course" cannot be denied to Addison on the basis of alleged futility.  *Id.* at 1282 n.6 ("When the plaintiff has the right to file an amended complaint *as a matter of course* … the plain language of Rule 15(a) shows that the court lacks the discretion to reject the amended complaint based on its alleged futility").

Should this Court determine that Addison's Second Amended Complaint still fails to state a claim in light of Defendants' motion to dismiss, Addison should be given an opportunity to cure its defects.  Dismissal with prejudice is not appropriate at this point in the proceedings.  *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) ("Generally, '[w]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice' ") (citation omitted).  This is especially so when Addison has received no prior notice from this Court or the

defendants that his initial complaint lacked merit in any way, and where Addison had passed the "screening" conducted by this Court pursuant to section 1915A of the Prison Litigation Reform Act.[7] (*See* D.E. 7, 11.)  *See id.* at 1164 (district court erred in denying leave to amend complaint where court's "prior opinion created … the impression" that complaint met pleading standard).

To the extent Defendants make any substantive arguments in the portion of their brief concerning the dismissal of Addison's claims (*see* pp. 13-21 of Defs.' Brief [D.E. 34]) that have not already been addressed by his Second Amended Complaint, Addison will respond to those arguments below.

## II.  PICKETT AND THE OTHER DEFENDANTS ARE LIABLE UNDER THE EIGHTH AMENDMENT FOR IGNORING A KNOWN RISK OF HARM TO ADDISON'S PERSONAL SAFETY AND WELL-BEING.

### A.  Corrections Officials Violate the Eighth Amendment When They Are Deliberately Indifferent to the Safety and Well-Being of an Inmate.

*Farmer v. Brennan*, 511 U.S. 825 (1994), is the seminal case when it comes to Eighth Amendment, deliberate indifference claims.  That case involved a transsexual prisoner in federal custody who was beaten and raped by other inmates after being moved from protective custody to general population.  The inmate filed a lawsuit alleging that BOP officials acted with deliberate indifference to his safety when they transferred him to general population despite their knowledge that, because of the inmate's sexual identity and appearance, he was especially vulnerable to the kind of attacks he ultimately suffered.  The lower courts ruled against the inmate and for the BOP defendants but the Supreme Court vacated their decisions.  The Court observed that in rejecting the inmate's claim the lower courts may have wrongly "placed decisive

---

[7] The standard employed by a court pursuant to a screening conducted under this provision is as follows: "On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint --- (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted or (2) seeks monetary relief from a defendant who is immunity from such relief"  28 U.S.C. § 1915A(b)(1)-(2).

weight on [the inmate's] failure to notify respondents of a risk of harm." 511 U.S. at 848. Such "advance notification", the *Farmer* Court concluded, is not a "necessary element of an Eighth Amendment failure-to-protect claim." *Id.* at 849.

Most correctional officer defendants, however, ignore this critical aspect of the *Farmer* decision and seek dismissal of an inmate's deliberate indifference claim because, they argue, the inmate essentially failed to predict for the officers when and how he would be assaulted by another inmate. *See, e.g.*, *Rodriguez v. Sec. of Dep't of Corrections*, 508 F.3d 611 (11th Cir. 2007). The defendants do the same here. (*See* Defs.' Brief 22.) But *Farmer* counsels otherwise.

In *Farmer*, the Supreme Court set forth the following two-part test for deliberate indifference: "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he [1] knows that inmates face a substantial risk of serious harm and [2] disregards that risk by failing to take reasonable measures to abate it." 511 U.S. at 847. The first can be called the subjective element of the test, the second part, objective.

Importantly, the kind of subjective knowledge that gives rise to liability under the Eighth Amendment need not be as specific or detailed as the defendants suggest. Were the opposite true, *Farmer* would not have come out the way it did: in favor of the plaintiff and against the officer defendants.

Moreover, *Farmer* made clear that a plaintiff can prove subjective knowledge by showing, through "circumstantial evidence", that the risk of harm to the inmate was so "obvious" that the official being sued necessarily had knowledge of it. *Id.* at 842. As the Court put it: "[u]nder the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough

that the official acted or failed to act despite his knowledge of a **substantial risk** of serious

harm." *Id.* (citations omitted) (emphasis added).

An officer's advance knowledge of the identity of the specific assailant who ultimately

harmed the plaintiff or even the identity of the victim who suffered at the hands of his assailant is

also not dispositive of the subjective prong.  According to the *Farmer* Court:

> [A] prison official [may not] escape liability for deliberate indifference by
> showing that, while he was aware of an obvious, substantial risk to inmate safety,
> he did not know that the complainant was especially like to be assaulted by the
> specific prisoner who eventually committed the assault.  The question under the
> Eighth Amendment is whether prison officials, acting with deliberate
> indifference, exposed a prisoner to a sufficiently substantial "risk of serious
> damage to his future health" and **it does not matter whether the risk comes from
> a single source or multiple sources, any more than it matters whether a prisoner
> faces an excessive risk of attack for reasons personal to him or because all
> prisoners in his situation face such a risk.**

*Id.* at 843 (emphasis added).

As the Eleventh Circuit put it: "[A]n official may not escape liability merely by showing

that he did not know the claimant was likely to be assaulted or that an assault would be

committed by the specific prisoner who eventually committed the assault."  *Hale v. Tallapoosa*

*County*, 50 F.3d 1579, 1583 (11th Cir. 1995) (citation omitted).  What matters is that the official

being sued "had subjective knowledge of a **generalized, substantial risk** of serious harm from

inmate violence." *Id.* (emphasis added).

At the end of the day, and despite the defendants' blanket denials and boilerplate

declarations, it must not be forgotten that:

> "[P]rison officials have a duty … to protect prisoners from violence at the hands
> of other prisoners."  Having incarcerated "persons [with] demonstrated
> proclivi[ties] for antisocial, criminal, and often violent, conduct, having stripped
> them of virtually every means of self-protection and foreclosed their access to
> outside aid, the government and its officials are not free to let the state of nature
> take its course.  Prison conditions may be "restrictive and even harsh" but
> gratuitously allowing the beating or rape of one prisoner by another serves no

"legitimate penological objectiv[e]," any more than it squares with "evolving standards of decency."  Being violently assaulted in prison is simply not "part of the penalty that criminal offenders pay for their offense against society."

*Id.* at 833-34 (citations and quotations omitted).

> **B.    Pickett and the Other Defendants Are Not Entitled to Summary Judgment.**

Pickett and the other defendants are not entitled to summary judgment on Addison's claims.  Addison has provided this Court with evidence that, if credited by a jury, would provide a basis for finding Pickett and the other defendants liable for their deliberate indifference to Addison's safety and welfare.  This evidence must be viewed in the light most favorable to Addison.  It is not the job of the Court to weigh the evidence before it or to evaluate the credibility of its sources at the summary judgment stage.  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment") (citations omitted).  As the Eleventh Circuit has observed, a district court "misapplie[s] the clear dictates of summary judgment [when it] assum[es] hotly contested facts against the non-moving party."  *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007).

> **1.    Defendants' Motion for Summary Judgment Is Premature and It Should Not Be Granted.**

Defendants have moved for summary judgment in the absence of any discovery at all. The Eleventh Circuit has consistently held that "summary judgment should not ordinarily be granted before discovery has been completed."  *Ala. Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 609 (5th Cir. 1979).  *See also Jones v. City of Columbus, Ga.*, 120 F.3d 248, 253 (11th Cir. 1997); *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992); *Snook v. Trust*

*Co. of Ga. Bank, N.A.*, 859 F.2d 865, 870 (11th Cir. 1988).[8]  This is especially so in a case like Addison's where no discovery has been conducted, and where, as he explains below, the merits of defendants' arguments are based on disputed issues of material fact.

> **2. Pickett Is Not Entitled to Summary Judgment on Addison's "Placement" Claim.**

Addison claims that Pickett was deliberately indifferent when he placed Addison in the same recreation cage as Gutierrez.  In support of this claim, Addison has provided this Court with sworn statements from himself and two former inmates at FCI-Jessup.  This evidence establishes that Pickett, as an officer assigned to the SHU, knew Gutierrez's history of assaulting black inmates.  He also knew that Gutierrez was a member of the Sureno gang and that members of this gang are infamously racist against blacks.  The evidence also suggests that Pickett violated his own policies and procedures by placing Addison, an African-American, in a recreation cage with Mexican inmates.  When Addison warned Pickett not to place him (Addison) in the same cage as Gutierrez, Pickett brushed off Addison's concerns.  Pickett's behavior created a lawless, "devil may care" environment, and it is reasonable to infer that his recklessness gave Gutierrez additional impetus – over and above the one fueled by his prejudice against blacks – to ambush and assault the defenseless Addison.  *See Fisher v. Koehler*, 692 F. Supp. 1519, 1539-40 (S.D.N.Y. 1988) (noting expert witness opinion that "[w]hen inmates live

---

[8] While Rule 56 provides for a vehicle by which a non-movant may respond to a summary judgment motion by requesting additional discovery, this is generally done in cases where some discovery has already been conducted.  *See* Fed. R. Civ. P. 56(d); *see also Jones v. Secord*, 684 F.3d 1, 6 (1st Cir. 2012) ("Rule 56(d) affords a safety net for parties that need more time to gather facts essential to resist a motion for summary judgment").  It is rarely done in cases like the one here where absolutely no discovery has been had, and for good reason, since summary judgment involves a fact-intensive inquiry.  Should this Court disagree, however, Addison respectfully requests the leave of this Court to supplement his response to include a motion and supporting materials under Rule 56(d) of the Federal Rules of Civil Procedure, so that he may demonstrate to this Court the necessity for additional discovery and the denial of the defendants' premature motion for summary judgment.

in a lawless environment, they tend to be more lawless, more violent than they otherwise would be").

Pickett makes much of the warning that Addison gave him before Pickett placed Addison in the recreation cage with Gutierrez but his arguments are without merit. While Pickett has predictably denied that Addison ever expressed to Pickett his concerns about being placed in the same recreation cage as Gutierrez, (Pickett Decl. ¶ 5), this denial, when considered along with the other evidence presented by Addison, simply creates an issue of material fact; it doesn't give Pickett summary judgment. *See Rodriguez*, 508 F.3d at 611.

Pickett also argues that the warning conveyed to him by Addison was too general and therefore insufficient to give him the kind of notice that is required for deliberate indifference liability. But Addison's warning to Pickett cannot be viewed in a vacuum. It must be considered in light of all the evidence that Addison has presented to this Court. *See Farmer*, 511 U.S at 848 ("[The failure to give advance notice [of an attack] is not dispositive [of a claim for deliberate indifference]. Petitioner may demonstrate awareness by reliance on any relevant evidence"). This evidence suggests that Pickett knew of the substantial danger that Gutierrez posed to black inmates even *before* Addison voiced his concerns to Pickett. That Pickett, armed with this knowledge, still decided to place Addison in the same, confined area as Gutierrez and give Gutierrez the opportunity to confront a handcuffed Addison is the height of recklessness.

Nor is Pickett entitled to summary judgment because, he argues, Addison failed to inform him of any personal disputes or issues that Addison might have had with Gutierrez or because Pickett had no knowledge of any past quarrels between the two inmates. What matters for deliberate indifference liability is that Pickett had "subjective knowledge of a ***generalized, substantial risk*** of serious harm from inmate violence" to which he exposed Addison. *Hale*, 50

F.3d at 1583 (emphasis added).  Addison is "not required to show that [Pickett] knew 'precisely who would attack whom' " in order to survive summary judgment.  *Id.* (quoting *Farmer*, 511 U.S. at 844).  Here, the record reflects, and it is reasonable to infer, that Pickett knew of Gutierrez's turbulent and violent history with black inmates based on his position as a SHU officer and the notorious nature of Gutierrez's prior violence against black inmates.[9]

In an unfortunate example of blaming the victim, Pickett argues that had Addison actually feared for his life, he would have opted out of recreation rather than risk his own safety and allow Pickett to place him in the same cage as Gutierrez.  As an initial matter, Pickett is making a contributory negligence defense which has no place in a case involving intentional torts.  *See Santiago v. Lane*, 894 F.2d 218, 224 (7th Cir. 1990) (citation omitted).  This is because "[s]uch conduct differs from negligence not only in degree but in kind, and in the degree of societal condemnation attached to intentional torts."  *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 875 (6th Cir. 1982) (citing W. Prosser, Law of Torts, 426 (4th ed. 1971)).[10]  Moreover, the record is disputed as to whether Addison was given any meaningful choice.   He surely was not when he first signed up for recreation.  According to Addison, he had no idea who his cage-mates would be when he informed the SHU officer during his morning rounds that he wished to participate in recreation, and defendants do not claim otherwise.  So there is no reason to expect

---

[9] Contrary to Pickett's argument, the declaration of Defendant Wolfort is entirely consistent with Plaintiff's claim.  In that declaration, Wolfort only stated that he had no information of any disputes or conflicts between Addison and his assailant.  He made no reference to his knowledge of Gutierrez's hatred toward blacks in general, as Pickett claims Wolfort did.   (*See* Defs.' Brief 22.)

[10] This, as an aside, betrays the general misunderstanding and mischaracterization of Addison's claims by defendants, who seem to think that Addison is suing them because they breached their own policies and procedures.  (*See, e.g.*, Pickett Decl. ¶ 4.)  That, certainly, is one aspect of Addison's case, but his core complaint is that the defendants recklessly and willfully ignored Addison and that their actions led to the "gratuitous[] … beating of … [Addison] by [Gutierrez]."  *Farmer*, 511 U.S. at 833.  This is not negligence, this is recklessness in its purest form.

that Addison could have made an informed decision about whether to participate in recreation at that time.  Pickett's claim that he would have placed Addison in a different cage had Addison conveyed his concerns to him is directly contradicted by Addison and Velez, both of whom have stated that Pickett only offered Addison one option: take recreation in cage number five (with Gutierrez) or return to his cell.[11]  As an inmate in the SHU, Addison is only allowed recreation once a day for one hour.  Had he declined recreation, which is what would have happened had Addison insisted on being placed in a different recreation cage, Addison would have lost his one opportunity for fresh air and exercise for the day.  Recreation, it goes without saying, is something that inmates do not give up lightly.  Indeed, courts have found it unconstitutional for prison officials to deny an inmate his right to exercise and to fresh air.  See *Peterkin v. Jeffes*, 855 F.2d 1021, 1031 (3d Cir. 1988) ("There is no question that meaningful recreation 'is exteremly important to the psychological and physical well-being of the inmates' ") (quoting *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979)), and the other cases cited therein.  By telling Addison, in essence, he could "take it or leave it", Pickett put Addison in an impossible position; Addison should not have had to exchange one fundamental right (the right to be placed in a safe and secure environment) for another (the right to the kind of physical and mental stimulation that outdoor exercise offers an incarcerated person).  The Constitution required that Addison be given both, and Pickett is wrong to argue that Addison's failure to choose one over

---

[11] Interestingly, while Pickett never transferred Addison to another cage, his admission to this Court that he could have done so creates an issue of fact as to the reasonableness of Pickett's actions.  That is, Pickett chose to ignore the threat of substantial harm posed by Gutierrez to Addison even though he had the means to readily defuse the threat to Addison by putting him in a different cage.  *See Hale*, 50 F.3d at 1583-84 (failure of Sheriff to pursue "several reasonable measures to reduce the risk of violence that were available to [him]" precluded the grant of summary judgment); *see also Rodriguez*, 508 F.3d at 623 n.18 (rejecting argument of officer defendants that they could not have caused the inmate's injury because they had no authority to control the placement of the inmate in protective custody where the defendants admitted in their depositions that could have initiated the process by which such a placement could be made).

the other means that Addison is the one at fault for the brutal beating he suffered at the hands of a known racist inmate.  In any event, Pickett's argument assumes that Addison had a duty to protect himself from his surroundings.  He did not; Pickett did.  *Rodriguez*, 508 F.3d at 616-17 ("The Eighth Amendment imposes a duty on ***prison officials*** 'to protect prisoners from violence at the hands of other prisoners' ") (quoting *Farmer*, 511 U.S. at 833) (emphasis added).  For these reasons, a jury could find Addison's decision to enter the recreation cage, rather than opt out of recreation entirely, unremarkable from a deliberate indifference standpoint.

Pickett's reliance on *Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990) (per curium), a pre-*Farmer* case, is misplaced.  The facts in that case do not resemble the ones before this Court. The officer who had been sued by the inmate in *Brown* for failing to protect him from an assault by another inmate knew next to nothing about the potential danger to which he exposed the inmate.  All the guard in *Brown* knew was what the inmate had told him: that there was a "racial problem" in his cell.  *Id.* at 1536.  This is in marked contrast to this case.  As a SHU officer, Pickett had specific information of Gutierrez's threat profile vis-à-vis Addison and other black inmates.  He knew Gutierrez was a member of the Sureno gang and that Gutierrez landed in the SHU because he had started a racial disturbance with black inmates that led to a 2-day lockdown of the prison compound.  The fact, seized on by Pickett, that the inmate in *Brown* returned to his cell voluntarily lacks any context whatsoever and therefore has no bearing on Addison's claim. For example, the decision in *Brown* does not explain whether there were areas of the jail which were open to the inmate and in which the inmate could have taken refuge (like a day room), rather than return to his cell.  Indeed, the fact that the inmate in *Brown* was able to see the jail captain to report his concerns indicates that the inmate had a greater freedom of movement than what was given to Addison at the time Pickett placed him in the cage with Gutierrez.   For all

16

these reasons, *Brown* is distinguishable and of no help to Pickett.  Pickett is not entitled to summary judgment on Addison's "placement" claim.

### 3.   Arnett, Bowen, Mosely, Pickett and Wolfort Are Not Entitled to Summary Judgment on Addison's "Failure to Intervene" Claim.

Addison's claim against all the defendants for their failure to intervene in Gutierrez's beating of Addison presents a classic situation of deliberate indifference.  Each of the five defendants stood outside the recreation cage when Gutierrez started assaulting and beating Addison.  There they stood, waiting and watching for several minutes, before entering the cage and restraining Gutierrez.  By that time, Gutierrez had already tired himself out from his vicious assault on Addison, with Addison lying unconscious and bleeding on the floor.

In moving for summary judgment on this claim, Defendants all seek refuge in prison policy as the reason why they did not intervene sooner.  Their argument is that they had to "wait" until a sufficient number of officers arrived, establishing a so-called "reasonable staff-to-inmate ratio", before they could safely enter the cage and restrain Addison's assailant.  (*See* Carrino Decl. ¶ 8.)[12]  In essence, Defendants claim that they were not deliberately indifferent because they responded reasonably to the beating.  *See Farmer*, 511 U.S. at 844.  But this argument leaves more questions than answers, especially in a case that has seen no discovery at all.

The Third Circuit in *Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2012) addressed a similar defense on similar facts.   In that case, an inmate sued several BOP guards claiming that the guards failed to come to his aid while he was being beaten by another inmate inside a "SHU recreation pen."  *Id.* at 372.  Like the defendants here, the defendants in *Bistrian* claimed that they acted reasonably because they had to wait until "enough staff were present" before they

---

[12] "Carrino Decl." refers to the Declaration of Glenn Carrino submitted as part of the defendants' motion for summary judgment.  (*See* D.E. 34-1 at 14-15.)

could intervene to stop the beating. *Id.* But this did not warrant the dismissal of the inmate's

claim. As the Third Circuit observed:

> With respect to the Northington attack, Bistrian [the plaintiff] claims that Sr.
> Officer Jezior was deliberately indifferent because he intervened "[o]nly after
> several minutes of continued pummeling." But, according to Jezior's post-incident
> memorandum (which Bistrian attached to his complaint), Jezior was not standing
> around and doing nothing. He came to the SHU recreation pen in response to an
> alarm and, when he arrived, several officers (himself included) unsuccessfully
> ordered the assailant to stop. When "enough staff were present," they entered the
> pen and subdued the assailant. At this point, we must construe the facts in the
> light most favorable to Bistrian and afford him all reasonable inferences. With
> that in mind, we believe that Bistrian's allegations raise enough questions about
> the reasonableness of Jezior's response to preclude dismissal. How long did Jezior
> shout orders to Northington before realizing that his words were futile? How
> often, in Jezior's experience, does a prisoner stop violently assaulting another
> inmate simply because a guard orders him to do so? How many guards are
> "enough" to break up a fist fight? Discovery is needed. It may be that summary
> judgment for Jezior is on the horizon. But right now we conclude that Bistrian has
> plausibly alleged that Jezior responded unreasonably to the attack, and thus this
> claim survives a motion to dismiss.

*Id.* (citations omitted).

The evidence relied on by the Defendants is even more sketchy than the information that

was before the *Bistrian* court. Defendants do not specify the "sufficient" number of officers that

would have been required to safely end the assault on Addison. The Defendants have not

identified any prior instances where more than five officers were required to subdue a single,

unarmed inmate who was assaulting a handcuffed, defenseless inmate. Nor do the Defendants

provide any specifics on the dangers they confronted with respect to the assault (as opposed to

the generalized dangers that might be present in every prisoner-related incident) or the average

amount of time that generally passes before officers intervene to stop an inmate-on-inmate

assault.[13] The Defendants have not even disclosed to this Court what, if anything, they did to

---

[13] Defendants suggest that it would have been reasonable for them to wait a few minutes to
intervene and stop one inmate from beating another, defenseless inmate. Putting aside that this

stop Gutierrez from beating Addison, short of activating a "body alarm" and waiting for the "sufficient" number of officers to arrive, the same type of call-and-wait approach the *Bistrian* court found insufficient to avoid discovery. These unanswered questions present issues of material fact that cannot be resolved in the Defendants favor on summary judgment. The appropriate course of action here is discovery not dismissal.[14]

The Defendants argue that the legality of their conduct should be judged in the context of competing penological concerns. But this is not the law. Such a balancing approach is generally reserved for claims against a prison official who is accused of "malicious and sadistic" conduct through his "excessive use of physical force … in response to disturbances". *DeSpain v. Uphoff*, 264, F.3d 965, 976 (10th Cir. 2001). Where an inmate makes a conditions of confinement, deliberate indifference claim, like Addison does here, liability "can … be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). This is because the "[government's] responsibility to [ensure the personal safety of prisoners] does not ordinarily clash with other equally important governmental responsibilities." *Id*. Moreover, the use of such a balancing approach is especially inappropriate where the defendant "guards have not identified a competing obligation which inhibited their efforts to protect inmates." *Wright v. Jones*, 907

---

issue is not one that can be resolved in the defendants' favor on summary judgment, the argument of the defendants demonstrates a fundamental lack of common sense. It takes but a moment's reflection to realize that (a) a punch or kick can be thrown in a matter of seconds; (b) there are sixty seconds in a minute; and (c) an individual could conceivably throw as many as sixty punches or kicks within a minute. It is reasonable to infer, and the defendants do not dispute, that Addison had been subjected to such a pummeling where he was not only handcuffed but also trapped in a small cage together with his assailant.

[14] Defendant Wolfort claims in his Declaration that he was not present at Addison's recreation cage when the assault began. (Wolfort Decl. ¶ 7.) But Addison has presented this Court with evidence to the contrary: that Wolfort was one of the officers who stood by and watched as Gutierrez assaulted Addison for several minutes. (*See* Tomlinson Aff. ¶ 5.) This creates an issue of material fact and Wolfort is not entitled to summary judgment at this point in the proceedings.

F.2d 848, 851 (8th Cir. 1990) (citation omitted).  Here, the defendants have provided no evidence

that their delay in stopping the assault on Addison resulted from a specific, competing

penological concern.  Indeed, no such concern could have materialized where all the inmates in

the recreation area were either in cages or were restrained by handcuffs.  The situation

confronting the defendants was certainly a far cry from the situation in *Whitley* – a case that did

employ a balancing approach – where the guards were sued for using excessive force after they

shot a prisoner in an attempt to rescue a guard held hostage during a volatile, prison riot.

## III. PICKETT AND THE OTHER OFFICER DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

### A. The Doctrine of Qualified Immunity is Not Only Meant to Shield Public Officials from Liability, It is also Meant to Hold Them Accountable For Unlawful Conduct.

This Court is well versed in the basic principles of qualified immunity and they will not

be repeated here save for a few important points.  No one disputes that the Defendants were, at

all times relevant to the complaint, carrying out discretionary functions so that they are entitled

to claim the defense of qualified immunity.  *See Hill v. DeKalb Regional Youth Detention Ctr.*,

40 F.3d 1176, 1185 n.17 (11th Cir. 1994) ("A government official acts within his or her

discretionary authority if objective circumstances compel the conclusion that challenged actions

occurred in the performance of the official's duties and within the scope of this authority").  Yet

the doctrine of qualified immunity serves not only as a shield from liability, it was also crafted as

a way to " 'hold public officials accountable when they exercise power irresponsibly.' " *Randall*

*v. Scott*, 610 F.3d 701, 714-15 (11th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 129

S. Ct. 808, 815 (2009)).  As the Eleventh Circuit once put it:

> Qualified immunity is, as the term implies, qualified.  It is not absolute.  It
> contemplates instances in which a public official's actions are not protected.  The
> principles behind qualified immunity would be rendered meaningless if such

immunity could be invoked to shelter officers who, because of their own interests, allegedly flout the law, abuse their authority, and deliberately imperil those they are employed to served and protect.

*Kingsland v. City of Miami*, 382 F.3d 1220, 1233-34 (11th Cir. 2004) (citations omitted).

For these reasons, a public official is entitled to qualified immunity only if the Court finds that his actions " 'd[id] not violate clearly established statutory or constitutional rights ....' " *Id.* at 1231 (citations omitted). A right is "clearly established" if "a reasonable official would understand what he is doing [or failed to do] violated that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While this "understanding" should be based on the law that was in existence at the time of the incident at issue, the Supreme Court has emphasized that this body of law – usually but not always composed of court decisions – need not contain facts that are "materially similar" to those presented in the case at hand. In other words, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Needless to say, the more egregious and shocking the conduct, the greater the "notice" an official has that his conduct violates legal norms. *See Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002). In these so-called "obvious clarity" cases, *id*. at 1350, n. 18, the "official's conduct lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily apparent to the official, nothwithstanding case law," *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (citation and quotations omitted).

When undertaking the qualified immunity inquiry, this Court should construe all facts in the light most favorable to the Plaintiff and take all allegations made by him as true. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Whether an official is entitled to qualified immunity depends

21

on the "objective reasonableness [of his actions], regardless of his underlying intent or motivation." *Kingsland*, 382 F.3d at 1231 (citations omitted).[15]

> **B.      Pickett and the Other Defendants Had Fair Notice That Their Conduct Violated Addison's Eighth Amendment Right to be Free from Cruel and Unusual Punishment.**

This case presents a textbook situation of deliberate indifference on the part of Pickett and the other officer defendants.  With regard to Pickett, he had "fair notice" that he would be subject to liability were he to ignore the substantial risk of danger posed by Gutierrez to Addison and place them together in the same recreation cage.  Yet that is precisely what he did.  Pickett cannot escape accountability for his actions by claiming qualified immunity.

The Supreme Court's decision in *Farmer v. Brenann* and the Eleventh Circuit's decision in *Rodriguez v. Secretary of Corrections*, both of which were on the books long before the beating occurred, defeat Pickett's claim of qualified immunity.[16]  *Farmer* involved a claim similar to Addison's where a transsexual inmate in federal custody alleged that BOP officers ignored the risk to his safety when they transferred him from protective custody to general population knowing that an inmate in his position would have been subject to a substantial risk of violence from other inmates.  511 U.S. at 829-30.  The inmate in *Farmer* did not give prison officials precise advance warning that he would be attacked, but he pointed to other,

---

[15] This is true even in a case that involves a claim of deliberate indifference where the constitutional inquiry is partly subjective.  As the Fifth Circuit has explained:

> [T]he subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident…. And, under that standard – the minimum standard not to be deliberately indifferent – the actions of the individual defendants are examined to determine whether, as a matter of law, they were *objectively* unreasonable.

*Hare v. City of Corinth, Miss.*, 135 F.3d 320, 328 (5th Cir. 1998).

[16] *Farmer* was decided in 1994, *Rodriguez*, in 2007.  *See* 511 U.S. at 825; 508 F.3d at 611.

circumstantial evidence like his prior placement in protective custody and the generalized knowledge among prison officials of the vulnerability of transsexual prisoners, as a way to demonstrate the officers' deliberate indifference.  *Id.*  The Supreme Court found such evidence sufficient to warrant more discovery, and denied the defendants summary judgment.  *Id.* at 848-49.  In doing so, the *Farmer* Court made clear that "advance notice" was not a "necessary element of an Eighth Amendment failure-to-protect claim."  *Id.* at 849.

*Rodriguez* involved an inmate in state custody whom officers recklessly subjected to a risk of harm when they released him from protective custody into general population knowing that the inmate was at risk of being attacked because he had renounced his membership with the Latin Kings gang.  508 F.3d at 612-13.  In *Rodriguez*, the court made clear that even if the officers did not know precisely when and how danger would befall an inmate, all that mattered for deliberate indifference purposes was the officer's knowledge of a generalized but substantial danger vis-à-vis the inmate.  *Id.* at 619.  In *Rodriguez*, that danger took the form of an inmate's decision to renounce his gang membership which became a source of potentially violent retribution against the inmate by the existing members of his former gang.  It made no difference to the *Rodriguez* court whether the officer defendants knew whom amongst the gang members was going to carry out the attack on the inmate or when the attack would occur (i.e., the "who, what and where" of the threat) since the threat against the inmate existed just the same.

The same goes for Pickett.  As a SHU officer, he knew that Gutierrez was a member of the Sureno gang whose members are racist against blacks.  As a SHU officer, he also knew that Gutierrez had previously assaulted black inmates because of their race and even caused the compound to be locked down for two days, a rare occurrence in any correctional facility.  In light of this evidence, Pickett's claim that he did not know when and how Gutierrez's violent, racist

behavior would manifest itself is beside the point.  Pickett had fair notice under Supreme Court

and Eleventh Circuit precedent that Gutierrez posed a substantial risk of danger to Addison and

black inmates alike, and he must be held accountable for recklessly exposing Addison to this

source of harm.

The conduct of the defendants in ignoring Addison and subjecting him to a prolonged

beating by Gutierrez presents a situation that constitutes deliberate indifference on its own facts.

Addison need not present this Court with any analogous caselaw to refute the Defendants' claim

of qualified immunity on these allegations.   The Supreme Court decided *Farmer* with a situation

like Addison's clearly in mind.  To that end, it made clear that if the Eighth Amendment is meant

to do anything, it's meant to prohibit prison officials from "gratuitously allowing the beating or

rape of one prisoner by another…."  511 U.S. at 833.  Here, the violent beating inflicted on

Addison in the direct and passive presence of the defendants was nothing if not "gratuitous".

The Defendants had a sworn duty to protect the personal safety of all inmates in their custody,

including Addison.  But instead of intervening to stop the Addison beating, they stood idly by

and watched it unfold for several minutes.  They did all this even though Addison was at the

complete mercy of his attacker, having been handcuffed and locked inside a small cage, not to

mention the fact that the defendants vastly outsized and outnumbered Addison's unarmed

assailant.   Under these facts, the conduct of the defendants "lies so obviously at the very core of

what the [Eighth Amendment] prohibits that [its] unlawfulness … was readily apparent to the

[defendants], nothwithstanding case law."  *Lee*, 284 F.3d at 1199 (citation and quotations

omitted).

That is not to say that other courts have not condemned similar conduct; they have, and

often in the strongest terms.  *See, e.g.*, *Grieveson v. Anderson*, 538 F.3d 763,   (7th Cir. 2008)

(describing as "quintessential deliberate indifference" the act of an officer who watches but does not intervene in an inmate-on-inmate assault); *Haley v. Gross*, 86 F.3d 630, 642 (7th Cir. 1996) (describing as "a paradigm case of deliberate indifference" an officer's conduct of ignoring and walking away from a heated and "extremely volatile" dispute between two inmates). *See also Odom v. S.C. Dep't of Corrections*, 349 F.3d 765, 773 (4th Cir. 2003) ("[A] prison official acts with deliberate indifference when he ignores repeated requests from a vulnerable inmate to be separated from a fellow inmate who has issued violent threats which the aggressor will likely carry out in the absence of official intervention") (collecting cases).

For these reasons, the defendants are not entitled to qualified immunity.  No reasonable officer would have done what the defendants did in ignoring the clear risk of harm to Addison in light of the law that existed at the time of the incident.  Defendants cannot seek refuge in qualified immunity; they must be held accountable for their actions.

## CONCLUSION

This Court should reject the Defendants' attempts to dismiss Addison's claims at so early a stage in the litigation.  The law clearly supports a finding of liability on the present record when it is viewed in the light most favorable to Addison.  The defendants' arguments for dismissal and summary judgment are vague, conclusory and call for inferences of fact adverse to Addison.  This is simply not the stuff of which summary dismissal is made.  Defendants' motion to dismiss, or, in the alternative, motion for summary judgment should be denied.

Respectfully submitted this 3rd day of February, 2014.

/s Albert Wan, Esq.
Attorney for Plaintiff, Sean Addison
(Georgia Bar No. 334224)

215 Church Street, Ste. 110
Decatur, Georgia 30030
404-827-7760 | albert@albertwanlaw.com

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on February 3, 2014 I electronically filed the attached with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Melissa S. Mundell
Assistant United States Attorney
P.O. Box 8970
Savannah, Georgia 31412
(912) 652-4422
melissa.mundell@usdoj.gov

/s Albert Wan, Esq.      
Albert Wan
(Georgia Bar No. 334224)

Albert Wan, Attorney at Law
215 Church Street
Suite 110
Decatur, GA 30030
albert@albertwanlaw.com
(404) 872-7760